IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATALIE M. GRIDER** and | : | |
| **KUTZTOWN FAMILY MEDICINE,** | : | Civil Action No. 05-MC-40 |
| **P.C.,** | : | |
| | : | |
| Plaintiffs | : | (Judge Kane) |
| | : | |
| v. | : | |
| | : | |
| **KEYSTONE HEALTH PLAN** | : | |
| **CENTRAL, INC.,** <u>et al.</u>, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM AND ORDER

**I.   Introduction**

Before the Court is the Motion of Defendants Highmark Inc. and John S. Brouse to Enforce a Subpoena Served on Third-Party Dennis Olmstead (Doc. No. 1). The motion relates to underlying litigation pending in the United States District Court for the Eastern District of Pennsylvania captioned <u>Natalie M. Grider, M.D. v. Keystone Health Plan Central, Inc., et al.</u>, Civil Action 01-CV-5641 ("underlying action"). Plaintiffs in that litigation are physicians specializing in family practice and internal medicine who have sued Defendant health insurers on the basis of alleged breaches of contractual capitation fee arrangements, along with charges of conspiracy and violations of federal racketeering laws. Plaintiffs are presently seeking class certification.

In the Plaintiffs' initial Rule 26 disclosures setting forth the names and addresses of those persons likely to have information relevant to Plaintiffs' claims, they listed Dennis Olmstead, the Vice President and Chief Economist of the Pennsylvania Medical Society ("PMS" or "Society"). The Society is a not-for-profit professional association chartered under Pennsylvania law with a principal

place of business located in Harrisburg, Pennsylvania. The Society represents approximately 20,000 physicians, and is the largest professional physician association in the Commonwealth. The PMS's mission is to promote the interests of physicians and their patients in Pennsylvania through information, education, public relations, and advocacy initiatives. (Doc. No. 5, at 2.)

On November 24, 2004, Highmark served Olmstead with a notice of deposition and subpoena duces tecum, commanding him to produce certain documents by December 6, 2004 and to appear at a deposition scheduled to commence December 7, 2004 at 9:00 a.m. The subpoena served upon Mr. Olmstead requested production of the following documents:

1. All documents that relate or refer to communications with Plaintiffs; Plaintiff's counsel, Kenneth Jacobsen, Francis Farina and Joseph O'Keefe; and Plaintiff's experts, Pamela Waymack, Mary Ratelle, and Kimberly J. Pollack, including, but not limited to, communications concerning the allegations set forth in the Amended Complaint, any of the Defendants identified in the Amended Complaint, and/or coding, bundling, downcoding, capitation, and class certification.

2. All documents that refer or relate to communications with third parties concerning Plaintiffs, Plaintiff's counsel, Kenneth Jacobsen, Francis Farina and Joseph O'Keefe; and Plaintiff's experts, Pamela Waymack, Mary Ratelle, and Kimberly J. Pollack, the allegations set forth in the Amended Complaint, any of the Defendants identified in the Amended Complaint, and/or coding, bundling, downcoding, capitation, and class certification.

3. All documents that relate or refer to communications with members of the Pennsylvania Medical Society concerning Plaintiff's counsel, Kenneth Jacobsen, Francis Farina and Joseph O'Keefe, Plaintiff's experts, Pamela Waymack, Mary Ratelle, and Kimberly J. Pollack, the allegations set forth in the Amended Complaint, any of the Defendants identified in the Amended Complaint, and/or coding, bundling, downcoding, capitation, and class certification.

4. All documents that relate or refer in any way to the subject matter of this action, including, but not limited to, the allegations set forth in the Amended Complaint, the allegations of the motion for class certification, documents addressing class certification, and documents addressing coding, bundling, downcoding and capitation.

>    5.    All documents that relate or refer to communications with Keystone Health Plan Central, Capital Blue Cross and Highmark, Inc.
>
>    6.    All documents that relate or refer to communications with the Pennsylvania Department of Insurance and/or the Pennsylvania Department of Health concerning or referring in any way to Keystone Health Plan Central, Capital Blue Cross and/or Highmark, Inc.

(Doc. No. 1, Ex. 2, Notice of Deposition and Subpoena Duces Tecum.)  Olmstead did not comply with the terms of the subpoena and was not produced for the deposition.  Under cover of a letter dated December 15, 2004, Olmstead's counsel provided certain documents in response to the subpoena duces tecum, although the parties dispute whether the production "fall[s] far short of the entire universe of responsive documents available to Mr. Olmstead."[1]  (Doc. No. 2, at 5.)

Together with its production of documents, Olmstead's counsel also produced a privilege log and advised Highmark that it would move to quash the subpoena if Highmark sought to compel Olmstead's deposition.  (Doc. No. 5, Ex. B.)  Highmark subsequently filed the motion to compel that is now before the Court, and Olmstead and the PMS have filed a brief in opposition, arguing that the subpoena should be quashed and a protective order entered because: (1) the subpoena allegedly places an undue burden on non-parties to the underlying action; (2) the subpoena allegedly seeks information and documents protected by the attorney-client privilege and work product doctrine; (3) the subpoena allegedly infringes upon the common interest privilege between the PMS and the plaintiffs in the underlying action; and (4) the subpoena seeks discovery of an unretained expert's opinion.

---

[1] Although Mr. Olmstead asserts that he produced "over 500 non-privileged documents," Highmark contends that the documents produced are comprised almost entirely of pleadings and other documents related to the underlying action, which were already in Highmark's possession. (Doc. Nos. 5, at 3; Doc. No. 6, at 2.)

**II.     Discussion**

    **A.     Relevance of Mr. Olmstead's Testimony**

The Federal Rules of Civil Procedure permit discovery of "any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Relevancy is to be construed broadly, and discovery is not limited only to admissible evidence, but rather extends to any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Id. "Although courts have imposed broader restrictions on the scope of discovery when a non-party is targeted, discovery rules are to be accorded broad and liberal construction." Packer v. Hansen, No. 98-380, 1999 U.S. Dist. LEXIS 17618, at *8-9 (E.D. Pa. Nov. 12, 1999). Relevance of the challenged discovery request must be determined by reference to the facts and circumstances of each case. Hall v. Harleysville Ins. Co., 164 F.R.D. 406, 407 (E.D. Pa. 1996).  Olmstead and the PMS argue that Highmark has failed to demonstrate the relevance of Mr. Olmstead's proposed testimony, claiming that Highmark's sole basis for seeking discovery is that Plaintiffs listed Mr. Olmstead in their initial Rule 26 disclosures. In response, Highmark contends that not only has Mr. Olmstead been identified as a party likely to possess information relevant to plaintiffs' claims, but the apparently extensive relationship among himself, the PMS, and plaintiffs' counsel "belies any assertion that his testimony is not relevant to this litigation." (Doc. No. 6, at 5.) The Court agrees with Highmark. Mr. Olmstead acknowledges that the PMS has "provided preliminary support and analysis to plaintiffs' counsel, in a mutual effort to seek relief for Dr. Grider and other similarly situated Pennsylvania physicians" and that the PMS has "continued to monitor the progression of this case and communicate with plaintiffs' counsel as part of a common interest in obtaining relief for Pennsylvania physicians . . . ." (Doc. No. 5, at 2.) Indeed, the

primary thrust of Olmstead's challenge to Highmark's discovery requests is that he and the PMS have such a significant interest in the underlying action that they are entitled to invoke various privileges against the discovery requests, including the attorney-client privilege, the common interest exception, and the work-product doctrine. The very fact that Mr. Olmstead seeks to invoke these privileges with respect to the underlying action casts doubt on his contention that his testimony is not sufficiently relevant to the litigation. For these reasons, the Court finds that Highmark has adequately demonstrated the relevance of Mr. Olmstead's testimony for purposes of taking discovery in the underlying action.

> **B.  Attorney-Client Privilege, Work-Product Doctrine, and Common Interest Exception.**

Mr. Olmstead contends variously that the Court should quash the subpoena because it requires that he disclose information protected by the attorney-client privilege, the work-product doctrine, or the common interest privilege. Highmark contends that none of these privileges is applicable to the discovery being sought.

> **i.  Attorney-Client Privilege**

The United States Supreme Court has recognized that the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also In re Grand Jury Investigation, 599 F.2d 1224, 1235 (3d Cir. 1979) (noting the attorney-client privilege exists to foster disclosure and communication between the attorney and the client). No bright-line rule governs the applicability of the attorney-client

privilege and, as a result, the applicability of the privilege should be determined on a case-by-case basis. Upjohn, 449 U.S. at 396-97. The Third Circuit has enumerated the traditional elements of the privilege as follows:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Investigation, 599 F.2d at 1233 (citation omitted). Courts have found that because the privilege obstructs the search for the truth and because its benefits are "indirect and speculative," it must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." Id. at 1235.

Mr. Olmstead claims that "any information [he] has obtained regarding this litigation was derived from communications with plaintiff's counsel or from analysis he engaged at the direction of Society's counsel in anticipation of its potential involvement in the present litigation. As such, these are exactly the kind of communications that go to the heart of the work product doctrine and attorney client privilege, and are protected from discovery." (Doc. No. 5, at 8.) Olmstead's assertion goes too far. As an initial matter, any information Olmstead obtained concerning the litigation from "communications with plaintiffs' counsel" is clearly not protected by the attorney-client privilege. Communications between Olmstead, the PMS (including its counsel), and the Plaintiffs' attorneys in the underlying action are not subject to the attorney-client privilege for the simple reason that neither Olmstead nor the PMS

claim to be represented by Plaintiffs' counsel.[2]  However, to the extent that Highmark seeks to discover communications between Olmstead and counsel to the PMS that were <u>not</u> shared with counsel for Plaintiffs in the underlying action or any other party, such privilege may shield such documents from discovery, and Olmstead would not be precluded from invoking the privilege.[3] With the exception of such documents, however, the Court finds that the attorney-client privilege does not apply, and does not provide a basis for refusing to turn over the documents requested in the subpoena.

### ii. Work-Product Doctrine

Olmstead also claims that he is not obligated to turn over a number of documents on the basis that the documents constitute work product.  Rule 26(b)(3) of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

> Trial Preparation: Materials.  Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the

---

[2]    Even assuming <u>arguendo</u> that the attorney-client privilege may have applied, it is clear that any privileged communications between Olmstead and counsel for the PMS were waived to the extent those communications were shared with Plaintiffs' counsel.  Further, as explained herein, the common interest exception cannot preserve the asserted privilege from being waived because neither Olmstead nor the PMS share an identical legal interest with Plaintiffs in the underlying action, a prerequisite to invoking the exception.

[3]    Olmstead has not clearly indicated that any of the documents sought by Highmark constitute communications strictly between himself and counsel to PMS.

substantial equivalent of the materials by other means.

Fed. R. Civ. P. 26(b)(3). The work-product doctrine "shelters the mental processes of the attorney, providing privileged area within which he can analyze and prepare his client's case." In re Cendant Corp. Sec. Litig., 343 F.3d 658, 661-62 (3d. Cir. 2003) (quoting United States v. Nobles, 422 U.S. 225, 238 (1975)).

The burden of demonstrating that the work-product doctrine applies rests with the party asserting the objection. Stabilus v. Haynsworth, Baldwin, Johnson & Greaves, P.A., 144 F.R.D. 258, 267-68 (E.D. Pa. 1992) (citations omitted). In determining whether the work-product doctrine applies, a court inquires "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (quotations omitted). As an initial matter, the Court questions Olmstead's standing to assert the work-product defense to the discovery requests at issue. To the extent Olmstead is refusing to turn over documents on the basis that they constitute work product of Plaintiffs' counsel in the underlying action (e.g., materials prepared by Olmstead at the request of Plaintiffs' counsel in anticipation of the underlying action), the Court finds that Olmstead lacks standing to assert the objection.[4] To date,

---

[4] The Court notes that Olmstead has not alleged nor established that he was retained by Plaintiffs' counsel to perform analysis or render any other services in the underlying action, other than to offer general assertions that the PMS was approached by Plaintiffs' counsel to provide assistance in the underlying action, and that the PMS "has provided preliminary support and analysis to plaintiffs' counsel, in a mutual effort to seek relief for Dr. Grider and other similarly situated Pennsylvania physicians." (Doc. No. 5, at 8.) Olmstead concedes that PMS's "ultimate role in this case . . . has yet to be determined." (Id.)

neither Plaintiffs nor their counsel have objected that Highmark's discovery directed at Olmstead seeks protected work product. If the materials actually constituted work product in the underlying action, it would be incumbent upon Plaintiffs' counsel to lodge an objection to their disclosure and to provide an explanation as to why the material should be considered work product. See, e.g., United States v. Grass, No. 02-146, 2003 U.S. Dist. LEXIS 5196, at *10 (M.D. Pa. Feb. 11, 2003) ("it is the attorney and the client who hold the privilege, not the attorney's agent who may have generated work product at the attorney's behest"). Thus, the Court finds that Olmstead lacks standing to assert the work-product doctrine to the extent the documents requested constitute material Olmstead prepared at the behest of Plaintiffs' counsel in connection with the underlying action.

To the extent that Olmstead is asserting the work-product doctrine applies to shield material generated for the PMS at the request of its counsel, the Court finds that Olmstead has not met his burden of demonstrating that the material withheld was prepared in anticipation of litigation involving the PMS. Olmstead claims that the documents he withheld on the basis of work product "were prepared at the direction of the Society's counsel in anticipation of the Society's potential involvement in this litigation, and relate to the Society's analsysis of plaintiffs' claims." (Doc. No. 5, at 9-10.) Although Olmstead asserts that the PMS may seek to intervene in the underlying action, it is difficult to conceive of how the PMS can qualify as a potential Plaintiff in the putative class action where the class is comprised of physicians and other parties having a contractual relationship with the Defendants, particularly as Olmstead never contends that the PMS shares any of these characteristics. In any event, Olmstead has not adequately asserted, much less established, that the PMS may be involved in the underlying action outside of filing an amicus brief or a statement in support of the physicians comprising

the class. Although the Court recognizes that the PMS has an "interest in obtaining relief for Pennsylvania physicians," this interest alone does not cause PMS to have a direct role in the underlying action as a litigant. (Doc. No. 5, at 8.)

Indeed, Olmstead has not demonstrated how any of the requested documents can be considered the work product of the PMS, since Olmstead has not sufficiently demonstrated requested material was prepared in anticipation of any actual or anticipated litigation involving the PMS.[5] Accordingly, any materials Olmstead received or prepared that relate to the underlying action are not shielded under the work-product doctrine, because Olmstead has not demonstrated that the material was prepared in anticipation of litigation. See, e.g., Kirschbaum v. WRGSB Assocs., No. 97-5532, 1998 U.S. Dist. LEXIS 8860, at *3 (E.D. Pa. June 18, 1998) ("Documents created on behalf of a non-party are not protected by the work product rule. The rule exists to protect the privacy of the preparations of the attorneys and agents engaged in litigation. There is no reason to extend this protection to a non-party"); Hunter v. Heffernan, No. 94-5340, 1996 U.S. Dist. LEXIS 9244, at *12 (E.D. Pa. July 1, 1996) ("Documents prepared by nonparties to the present litigation are unprotected"). See also Ramsey v. NYP Holdings, Inc., No. 00-3478, 2002 U.S. Dist. LEXIS 11728, at *18-19

---

[5] Olmstead avers that the PMS is "presently involved in a similar class action against Independence Blue Cross," but Olmstead provides no explanation as to the nature of the PMS's involvement in that litigation. Moreover, assuming that the PMS is involved as a litigant in that class action, Olmstead does not assert that any of the material sought in Highmark's subpoena is related to the litigation against Independence Blue Cross. (Doc. No. 5, at 2 n.1.) Olmstead acknowledges that the documents he withheld "on the basis of work product were prepared at the direction of the Society's counsel in anticipation of the Society's potential involvement in this litigation, and relate to the Society's analysis of plaintiffs' claims." (Doc. No. 5, at 8.) (emphasis added). Accordingly, it would appear that Olmstead is conceding that any documents in his possession responsive to the subpoena relate solely to the underlying action, and do not constitute work product related to the litigation against Independence Blue Cross.

(S.D.N.Y. June 27, 2002) ("federal courts have repeatedly held, when confronted with the issue, that a non-party witness may not invoke work-product protection under [Rule 26(b)(3)] to preclude production of materials prepared by or for that witness, even if created in contemplation of the witness's own pending or anticipated litigation") (collecting cases); 8 C. Wright, A. Miller & R. Marcus, Federal Practice & Procedure: Civil § 2024 at 354-56 (2d ed. 1994) ("documents prepared by one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely-related lawsuit in which he will be disadvantaged if he must disclose in the present suit").[6]  For the foregoing reasons, the Court concludes that Olmstead and the PMS have not met their burden of demonstrating that the work product doctrine applies to preclude Highmark's discovery request in the underlying action.

### iii.     Common Interest Exception

Olmstead claims that the requested documents should be shielded from discovery pursuant to the common interest exception. The common interest doctrine functions as "an exception to the general rule that the attorney-client privilege is waived upon disclosure of privileged information to a third party." Katz v. AT&T Corp., 191 F.R.D. 433, 436-37 (E.D. Pa. 2000) (citing In re Regents of the

---

[6]     Olmstead argues that United Coal Co. v. Powell Constr. Co., 839 F.2d 958 (3d Cir. 1988) stands for the proposition that non-parties may invoke the protection of the work-product doctrine for documents prepared in anticipation of litigation. United Coal does not, however, refute the general rule that work-product protection is not available to non-parties. In United Coal, the Third Circuit found that the non-party insurance companies could invoke the work-product doctrine because they were pursuing subrogation claims. For this reason, the Court found that the district court "erred in treating the insurance companies as non-parties in this instance." Id. at 965. PMS has not asserted an interest in the underlying action similar to that of a non-party insurer pursuing a subrogation claim, and the Court finds United Coal to be distinguishable.

Univ. of Cal., 101 F.3d 1386, 1389) (Fed. Cir. 1996)).[7] The common interest privilege "does not create an independent privilege, but depends upon a proper showing of the other elements of the attorney-client privilege" or some other recognized privilege before it will apply.  Katz, 191 F.R.D. at 437 (citation omitted).  In other words, "because the common interest privilege simply 'expands application of the attorney-client privilege or the work-product doctrine to circumstances in which it might otherwise not apply,'" it does not apply "where the attorney-client privilege and work product doctrine do not."  Brill v. Walt Disney Pictures & Television, No. 00-55592, 2000 U.S. Dist. LEXIS, at *2 (9th Cir. Dec. 1, 2000) (quotation omitted).

In general, the common interest doctrine "preserves a privilege where two or more persons or companies share a common interest in a legal issue exchange privileged communications with one another."  In re Diet Drugs, MDL Docket No. 1203, 2001 U.S. Dist. 5494, at *14 (E.D. Pa. April 19, 2001).  The doctrine extends to protect information shared between parties with a "community of interest," which is an "identical legal interest with respect to the subject matter of a communication . . . ."  Id. at *14 (emphasis added) (quotation omitted).  As one court has explained, "[t]he nature of the parties' common interest . . . must be 'identical, not similar, and must be legal, not solely commercial.'"  In re Regents of the Univ. of Cal., 101 F.3d 1386, 1390 (Fed. Cir. 1996) (quoting Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1172 (D.S.C. 1974)).

Applying these principles to the case at bar, the Court finds that the common interest privilege

---

[7] One court has noted that "[d]espite its name, the common interest privilege is neither common nor a privilege.  Instead, it is an extension of the attorney-client privilege and of the work-product doctrine").  Ferko v. Nat'l Assoc. for Stock Car Auto Racing, Inc., 219 F.R.D. 396, 401 (E.D. Tex. 2003).

does not apply to shield Mr. Olmstead and the PMS from complying with the subpoena Highmark served upon them. First, the common interest exception is predicated on the existence of the attorney-client privilege, the work-product doctrine, or some other applicable privilege. As noted above, Olmstead has failed to establish that either the attorney-client privilege or the work-product doctrine apply to the instant discovery dispute.

Furthermore, neither Olmstead nor the PMS has an identical legal interest with Plaintiffs in the underlying action. As noted, the underlying litigation is a putative class action, wherein the class has been defined as "all physicians, medical practitioners, and physician/medical groups who participate, or participated in Keystone HMO's health maintenance organization in the Commonwealth of Pennsylvania from 1996 to the present day." (Doc. No. 2, Ex. A, Am. Compl., ¶ 11.) Nothing in Olmstead's brief suggests that he or the PMS could potentially join the class action as plaintiffs. Indeed, although the PMS purportedly has not resolved what its ultimate role in the underlying action may be, the organization recognizes that its role may extend no further than to file an amicus brief or a "statement in support" of the Plaintiffs. (Doc. No. 5, at 8.) Although PMS claims to be working to obtain "relief for Dr. Grider and other similarly situated Pennsylvania physicians," and that the PMS has a "shared and mutual interest in obtaining relief for Pennsylvania physicians," these representations do not cause the interests of Olmstead and the PMS to be legally identical to those of Plaintiffs in the underlying action. (Id.) Accordingly, the Court finds the common interest exception does not apply to shield Olmstead from complying with the terms of the subpoena or from appearing for a deposition in the underlying action.

      **C.**      **Soliciting Testimony from an Unretained Expert**

Olmstead argues that the subpoena should be quashed or subject to a protective order because the subpoena seeks improperly to elicit expert testimony from Olmstead in violation of Rule 45(c)(3)(B)(ii). (Doc. No. 5, at 8.) This rule provides that a court may quash or modify a subpoena if the subpoena:

> [R]equires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party[.]

Fed. R. Civ. P. 45(c)(3)(B)(ii). This subparagraph was added during the 1991 amendments to address a "growing problem . . . [of] the use of subpoenas to compel the giving of evidence and information by unretained experts," and to "provide appropriate protection for the intellectual property of the non-party witness . . . ." Schering Corp. v. Amgen, Inc., No. 98-97, 1998 U.S. Dist. LEXIS 13452, at *6 (D. Del. Aug. 4, 1998) (quoting Fed. R. Civ. P. 45, Advisory Committee Notes). The rule authorizes an unretained expert "to withhold their expertise, at least unless the party seeking it makes the kind of showing required for a conditional denial of a motion to quash as provided for in the final sentence of subparagraph (c)(3)(B) . . . ." Id.

Highmark contends that it seeks to depose Olmstead about his knowledge of Plaintiffs' claims and "the specific allegations of bundling, downcoding, and capitation shaving that have been made in this case, as well as his and the PMS's involvement with Plaintiffs and Plaintiffs' counsel." Highmark asserts that it "seeks to depose Olmstead as a fact witness and not as an expert witness . . . ." (Doc. No. 6, at 13.) Olmstead has not sufficiently demonstrated to the Court that his deposition is likely to focus on, or even touch upon, his allegedly expert opinions about the underlying action. On the limited briefing of this issue, the Court can only reasonably find that Highmark's proposed areas of inquiry are

sufficiently related to Olmstead's knowledge of factual issues relating to the underlying action and do not concern his opinions about the issues being litigated or the parties' theories of the case. Of course, to the extent that Highmark's questions during deposition stray from factual inquiry into an unauthorized exploration of Olmstead's expert opinion, Olmstead's counsel may object or take other steps necessary to protect Olmstead's interests. However, the Court does not find it necessary to quash or modify the subpoena under Rule 45(c)(3)(B)(ii) because it does not appear, on the face of the pleadings before the Court, that Highmark plans to depose Olmstead other than as a fact witness.

### D.     Undue Burden

Finally, Olmstead argues that the Court should issue a protective order because the subpoena places an undue burden on him. Rule 45(c)(3)(A) authorizes a court to quash or modify a subpoena on the grounds that the subpoena is unduly burdensome. When determining whether a subpoena places an undue burden on a person, courts consider issues such as relevance, the requesting party's need for the documents, the breadth of the request, the time period covered, the particularity with which the documents are described, and the burden imposed in responding. Barbine v. Keystone Quality Transport, No. 03-3426, 2004 U.S. Dist. LEXIS 9241, at *4-5 (E.D. Pa. May 17, 2004). Moreover, in cases where a non-party is the subject of discovery requests, courts may impose broader restrictions, particularly where a non-party is requested to produce documents of another non-party. Packer v. Hansen, 98-380, 1999 U.S. Dist. LEXIS 17618, at *15 (E.D. Pa. Nov. 12, 1999).

The Court finds that requests 1, 2, and 3 of the subpoena duces tecum are not overly burdensome, as any responsive documents would appear to be limited to, and relate specifically to, the underlying action. (See infra, at 2.) However, the Court finds that requests 4, 5, and 6 are overly

broad and unduly burdensome, particularly because neither Olmstead nor the PMS are parties to the underlying action, and because responding fully to these requests appears that it would require substantial effort and would likely require Olmstead to review and turn over documents potentially having nothing to do with the underlying action. (Id., at 2-3.)  Accordingly, Olmstead is directed to respond to requests 1, 2, and 3, and is excused from responding to requests 4, 5, and 6.  In the event Olmstead wishes any documents produced to remain undisclosed outside of the underlying action, he is entitled to follow the procedures that are set forth in the Stipulated Protective Order Governing Confidential Material that the parties entered into in the underlying action, as Highmark has suggested. (Doc. No. 2., at 11 n.3.)

With respect to Highmark's proposed deposition of Olmstead, the parties are directed to cooperate in scheduling the deposition for a mutually convenient time at a location that is within one hundred miles of Olmstead's place of employment.

**III.     Order**

And now, this 28th day of July 2005, for the reasons stated in the within memorandum, **IT IS HEREBY ORDERED THAT** the Motion of Defendant's Highmark Inc. and John S. Brouse to Enforce a Subpoena Served on Third-Party Dennis Olmstead is **GRANTED** in part and **DENIED** in part as follows:

1. Olmstead shall respond to discovery requests 1, 2, and 3 contained in the subpoena.

2. Olmstead is excused from responding to discovery requests 4, 5, and 6 contained in the subpoena.

3. The parties are directed to cooperate in scheduling Mr. Olmstead's deposition for a mutually convenient time at a location that is within one hundred miles of Olmstead's place of employment.

                                                                      S/ Yvette Kane  
                                                                      Yvette Kane  
                                                                       United States District Judge